Plaintiff invokes the mixed motive model. We did not abandon it in the lower court. We do not abandon it in this court. In this circuit, it may be different than the 8th Circuit. But in this circuit, the Supreme Court decision in Desert Palace does apply to summary judgment motions. We don't need to prove a pretext. We don't need to prove that there is a higher standard or a different standard. And we don't have to survive summary judgment by proving direct evidence. We don't have to prove specific or significant evidence. We believe that that mixed motive applies, and we ask that the court to apply it here. As the court knows, Mr. Shelley was laid off in 2003, June of 2003. The decision to lay off Mr. Shelley was motivated by age. We allege two different things. We allege that the retention exercises, especially in 2002, was motivated by age. But regardless of whether or not it was motivated by age, the decision to lay off was motivated by age. And that is a separate and distinct act by Boeing. And I'll address both of those. In reference to the layoff, we believe it's really not disputed. Although you have to look the evidence in light most favorable to Mr. Shelley, we believe the evidence is abundantly clear that he was laid off before less qualified and substantially younger employees. I think the evidence in the record demonstrates that abundantly clear. The problem, I guess, is that those are all kind of loose words. I mean, nobody is suggesting, I think, even from Boeing, certainly, that Mr. Shelley wasn't qualified. Indeed, I think they still say they have a fairly high regard for him. This was a layoff situation. So it's not a question of whether he was laid off because he wasn't qualified or perhaps because other people were less qualified. But a company in a layoff can take into account its needs and where someone fits into that company's particular needs. And so I guess what I'm saying is, to me, it's not helpful to use a word like more or less qualified in a layoff situation. But rather, if you could, it would be very helpful to point to specifics that indicate that age had anything at all to do with the layoff. Your Honor, I disagree with that. I disagree that they considered where he fit into the organization when they made the decision to lay him off. They considered where he fit into the organization when they gave him a C retention rating. When they reduced him from a B to a C, then they considered what particular job functions he was performing vis-a-vis other people. At least, they say they do. I mean, that's the testimony of one of their witnesses, Mr. Only. And that's the only testimony to that effect. But his specific job functions were not at issue when they decided to lay him off. And I believe, Your Honor, the law in this circuit is abundantly clear that in a layoff context, the basic thing the plaintiff has to show is that they continued to meet his skills, and he was older, and they laid him off before less qualified people. The court may reject that analysis if you want, but I think that's the law in this circuit. No, all I'm suggesting is that in a case where you've got a record that's that thick, it would be extremely helpful to me personally for you to identify specifics rather than to use characterizations. That's all I'm asking is for some help. I appreciate that, Your Honor. And that goes into the 2001 and 2002 retention ratings. And we believe that those are separate from the decision to lay off. We believe that the evidence, and I'll try to get very specific for Your Honor, but we believe that the evidence that they laid off out of numerical order, which the court, which they say I'm sorry, I just didn't understand you. I just didn't understand, sorry. I'll repeat it. The evidence is clear that they're supposed to rate these people with letter ratings. And then within each letter rating, they're supposed to rate them numerically. That evidence is clear. And it's clear that Mr. Selley was the highest rated C of all of those employees. But there was no evidence that they knew his age. That's not true, Your Honor. There is evidence that they knew his age. What is the evidence? And where in the record does it show that the people who made the 2002 decision knew his age? That would be different from the layoff decision. I know. I'm talking about the 2002 decision. The evidence is that there were documents that were brought to the retention, the merge meeting, in which Ms. Trout was the chair. She was the chair of the skill team meeting. And at that skill team meeting, it's her testimony that Mr. Olney says something different. Mr. Olney was the captain of the reduction team. But at the skill team meeting, Ms. Trout says that they brought resumes, they brought documents reflecting the various different information concerning all of the employees that worked there, and other documents were readily available to them. But did they list them by age? Was there a chart? These people are over 50, these people are under... It was just a general decision at that time. Wasn't that true? I don't think that is true, Your Honor. I don't think that is true. I think the evidence and the inferences, certainly from the evidence... You're inferring that they read all the resumes and figured out from the date they were born or how old they all were? Well, I'm sure that information was available, and beyond that, they knew how long they had been working there. Mr. Selley had been working there for over 30 years. Now, necessarily, they would have known that he was an older employee. I do think they had that information, and I do think that Mr. Olney's testimony to the contrary is absolutely not credible. His testimony is impeded throughout these proceedings, and he is an interested witness. And according to Rees v. Standards and Plumbing, you can't rely on somebody else. It's simply on the testimony of interested witnesses. If you could do that, then witnesses would say, oh, I didn't discriminate against him on the basis of age, and that would be sufficient. But we know that that's not sufficient. Go back to Judge Reimer's question about the layoffs, specifics about the layoffs. And he said, well, Boeing is looking to take its younger employees into the future. We're looking to rely on younger employees. And you want specific evidence? We believe that that is specific evidence. Of what? It's specific evidence of age discrimination. Well, it's in a vacuum. Everybody understands that the 2001 decision was not an adverse employment decision, okay? So the question is, with respect to the layoff, and it is undisputed, that nothing that took place in the earlier retention exercise had any connection with the subsequent retention exercise or the layoff. We believe it's admissible to show the corporate... I didn't say it wasn't admissible. Well... I said it doesn't show any link. Very different point. Well, I think Your Honor is wrong. And there is a case that's pending before the United States Supreme Court at this very moment, which I think will demonstrate the legal soundness of my argument. That case is Mendelsohn v. Sprint. And there was a Tenth Circuit case in which the Tenth Circuit decided that, in fact, other supervisors... This is an ADEA case. And it's a RIF, a reduction in force. And the Tenth Circuit found that other supervisors... The conduct of other supervisors would be relevant to the decision to lay off someone who was laid off, and that other supervisors didn't make that decision. And the Tenth Circuit found that that was relevant and that it was probative to show the corporate culture in the corporate environment. And we believe the comments by Mr. Moore is likewise probative of age discrimination because it shows Boeing's attitude in a RIF. It shows their attitude in laying off people that they're looking to lay off older people because they're relying on younger people to take them into the future. We believe that that is directly relevant to what happened to Mr. Selley. Mr. Needle, the people that actually did the termination were not the people that conducted the 2002 evaluation. Isn't that correct? And your client, although he was C then, became B, and then there was another exercise... The other way around, Your Honor. B is a better rating. C is... Yes, I understand that. I understand that. I thought that he was C in 2002, but then in the actual termination, he became a B being sponsored by his supervisor then, and then there was the discussion and he wound up a C and then led to his termination. So isn't there a cutoff, a lack of connection, sort of like in poker, a jumping straight here, we have one number left out? I don't think so, Your Honor. If Mr. Selley had been rated a B in the 2002 retention exercise instead of a C, then he would not have been let off in June of 2003. He would have had a higher retention rating, and that would have diminished the probability that he would have been let off. He was only let off because he was a C. They ignored his numbers entirely. They ignored his high numerical rating as a C. As a C. That's right. If he were a B instead of a C, he would not have been let off. Now, the Boeing Company says that, well, when we laid them off, we only laid them off... We only looked for the layoff within the context of the organization and not the entire enterprise. And that's completely contrary to the deposition testimony. That is just 100% pretextual. And beyond that, of course, it just makes no sense. But, Mr. Needle, that, it seems to me, leads us back to Judge Reimer's inquiry. Is there a difference in qualification in the ambience of a RIF and qualification to do what you're doing at the time when the C ratings and so forth... It seems to me there is, and your initial presentation was wrong, that he's qualified just to be what he was being. Ms. Trout, Geraldine Trout, was the captain of the so-called skill team. And I asked her about to what extent the current assignment was a criteria in the retention ratings. And Boeing insists that that's the whole reason why he got a low retention rating. And I asked Geraldine Trout about this, and she made it explicitly clear. And I quoted it in the record. I set it out in indented space. I asked her whether or not the current assignment was a criteria in giving employees a retention rating. And she said, no, it was not. And the Boeing documents say that it's knowledge, skills, and abilities. Her own supervisor said that Mr. Selling had all of these abilities which are easily transferable to all sorts of different jobs with the same job classification. He was the poster boy for Boeing, and he was great in a downsizing environment. There is at the very least, Judge Beam, a question of fact about whether or not his current work assignment was a legitimate criteria for the retention rating. They say it was. We say it wasn't. Geraldine Trout, who's the captain of the skill team, says it was not. And that creates a question of fact about whether or not it was. We believe that Mr. Selling was subjected to discrimination because they laid him off out of order. Mr. Only, who did the rating in the 2002 exercise, didn't bother to speak to his immediate supervisor because he didn't care. The rules are that you're supposed to consult with the supervisor and get a sense from the supervisor about how this employee fits into the scheme of things before you start rating them. But he didn't do that because he didn't care. He already knew that he was going to get rid of Mr. Selling because he knew that Mr. Selling was older. But wasn't Mr. Selling, as he obviously was very well qualified, but as the years went on, he was given administrative tasks that when they had a massive layoff, the jobs that he was doing could easily be absorbed by other people in the organization. Now, isn't this a business decision when you have a massive layoff, who you're going to retain and what skills are absolutely necessary to retain? And Mr. Selling undeniably had those skills. But his current job was administrative and doing things that the company no longer needed him to do. Well, that's what they say. That's not quite right, Your Honor. They still needed those skills. And it's not like Mr. Selling's job, just the things that he was doing, wasn't done by other people. That is important in the Ninth Circuit case law. They still had a need for his skills and the things that he was doing. But easily distributed to other people, adding on to their jobs. They did not need him to do those things anymore. Well, that's what they say, Your Honor. And, in fact, there's a conflict of the testimony. They say that that's why they gave him a low retention rating is because they thought his current job assignment was not very important. That's their case. That's what they say. And I asked Geraldine Trout about that. She said it wasn't part of the criteria for the retention rating, and she was captain of the skill team. It seems to me, Your Honor, that creates a question of fact. I suggest to the court that this business about his current job assignment is an interesting argument, but it's just purely pretextual. I think there's abundance of other evidence which point to the fact that Mr. Selling was old. Mr. Selling's not the only one who they laid off out of order, out of numerical order. Other people were laid off out of numerical order, and every single one of them was over the age of 40. Every single one of them, Your Honor. And that creates an inference of discrimination. This is only summary judgment. Your Honor may think that some of these arguments by the Boeing Company are viable. Maybe they are, but that's for the jury to decide. It's not for the court to decide. We're entitled to the inferences. The facts must be viewed in a light most favorable to Mr. Selling and not the other way around. And that's the way the Boeing Company wants it, and I suggest that's improper. I'd like to save my remaining time for rebuttal. Certainly. Mr. Sanders. May it please the Court. I'm James Sanders with Perkins Coie, and we represent the Boeing Company. There's a lot of facts that were undisputed in this case, and the big facts are what matter a lot. And happily it's been. Richard, please speak up. I'm sorry. Sure. Happily it's been a few years now, and so this is becoming more of a distant memory. But if you think back, the time after the September 11th attacks had a devastating impact on the commercial air industry. In fact, it really, with the scope of layoffs, the country hasn't seen and hadn't seen in years. In Boeing Commercial Air, which is based here primarily in the Puget Sound, which is the organization that Mr. Selly worked in, 47,000 people lost their jobs between 2001 and 2004. 50,000 remained. So almost half of the workforce was let go. Now, if you look at the job that Mr. Selly had, and you can look in the record, and this is at SER 86 and 87. There's a typo in the brief that puts it at 194 and 195, so I just want to make sure that that's correct in the record. It's 86 and 87. This is Mr. Selly's own resume of his duties. He has a second resume that's also in the record at SER 317 and 329. Study the resume. He describes what he's doing in his job. He's working in an administrative or secretarial role, even though he has a job title that is a computing process specialist. So he's working well below his grade, and he's doing things that, as Darlene Torres's unrebutted declaration shows, were very easily absorbed. Her testimony was that she took over his most significant duties and was able to do it in addition to her old job in two to four hours a week. And that's unrebutted testimony. If the process worked the way it was supposed to, Mr. Selly, despite the fact that he was very well liked, very well regarded, and did his job in an exemplary fashion, is exactly the type of person who should have lost their job if the process worked the way it was supposed to. If you're going to lose half of your people, you're not taking out the people that are building the planes, that are actually driving the business. You're going to take away the support people who are doing administrative or overhead functions that can be easily replaced. Mr. Sanders, for the purpose of retention, you were evaluating him on the job he was in at the time, and that only? No, I don't think that's a correct way to look at it, Your Honor. What happened was... Well, then why would he be the perfect person? Are you looking to the fact that he voluntarily sort of downgraded himself from a more responsible position to this? That's confusing to me as to what you did here. Okay, he did do that, but let me, I guess, take a step and describe. This is a two-step process in how the job that he was in made a difference at both steps of the way. The first part of the step is the 2002 retention exercise. That's the last exercise they do before he's laid off. This is where he comes into the exercise as a B-rated employee, but during the merge process, he's downgraded to a C. Now, we have a very fortunate circumstance in this particular case, something that's a little bit unusual, in that there's contemporaneous evidence of how the decision-making process worked, and that's in Guy Olney's email to Macy Mooring, who was Mr. Selley's supervisor at the time, that is quoted in verbatim in the briefing. And what that email says is Guy Olney is telling Macy Mooring, I'm fighting for Earl, I'm trying to keep Mr. Selley in his job, and I'm arguing with four other managers who have their own employees, and we're arguing about who's got the better skills, who's got the better job. Give me examples of something important that Mr. Selley is doing now. I need that, because what the other managers are telling me is, listen, we hear you say that Mr. Selley has these great skills, but if he has these great skills, why does his resume look like an admin person? You've got to convince us he's got these skills, because the job somebody does is perhaps the best objective evidence of how good their skills are. And that was the argument that Mr. Olney faced, and he couldn't rebut that argument, because the skills, Mr. Selley, because he was doing an unimportant job, the decision-makers, who did not know his age, decided he can't be that skillful, otherwise he'd be doing things more importantly. So that's the way that process works. It's contemporaneous in the record, undivided. But Mr. Needle is correct, isn't he, that the waitress certainly had his resume of the jobs that he had done. You just told me that. And that's going to be a pretty good hint as to how old this gentleman is, isn't it? You can't discern the ages of the employees from their resumes, Your Honor. Take a look at those resumes. You could not look at that and tell how old Mr. Selley was. So if he had done 10 different things, so it's possible that he only did them a month at a time, so he'd only been employed for 10 months or something like that? Is that what you're saying? Or it's possible he did it in a 10-year period. Some people start at Boeing when they're 18 years old. So you could have an incredible resume and be 38 years old at Boeing. So you just can't tell from somebody's resume what they're doing. So, again, to stick with the question before I move off, at the second step of the process, when they're deciding now, who are we going to lay off among the people that are rated a C, this is in Rich Bowman's original declaration, his reply declaration, is the only evidence that really explains how that process works. And a little bit of perspective, I think, on the type of job that Mr. Selley had is important here. He was a computing process specialist. This isn't the type of job, for example, where there are 100 people doing the same job title that are all working in the same room. This is, in fact, there were 160 of these folks spread out across the Puget Sound in 2001, when the first exercise was done. And they worked in multiple different organizations. And to illustrate, Mr. Bowman's organization had 450 employees. Only eight of them were in Mr. Selley's job title. And that was typical in every case. So it isn't the type of job where the cluster of the group makes sense to look at them as a cluster when you're deciding who are we going to lay off, because that would totally disregard the needs of each organization. So layoffs happen at the organization level, and there is no real dispute of that. Not that it would matter in this case, because even if there was a dispute, it's not a dispute that's indicative or suggestive of age bias, which I think, as several members of the panel have already noted, is the key issue here. And if I could just digress for a second and talk about the standard. It doesn't really matter what standard the court applies. If the court, as Judge Martinez did, if the court applies the McDonnell-Douglas burden-shifting standard, there's no evidence sufficient to create a circumstantial or circumstances that are suggestive of an influence of age bias. If they use instead the direct case, the direct standard is the new mixed motive standard, which has yet to be applied to ODEA cases in the Ninth Circuit. But if you did apply that, that's an even tougher standard. In that case, he's got to show evidence that age was a motivating factor. And that's what's missing in this case, and it doesn't matter what standard applies. What do you do with the testimony? Was it Ms. Trout, her testimony, that we want to have young employees? That's actually Tom Moore is the person that is alleged to have said that. Mr. Moore denied it in his sworn declaration, though obviously for purposes of summary judgment and purposes of disappeal, the panel has to assume that that's true. Mr. Moore was a lower-level human resources employee. He's not a manager. He says he didn't say that, but if he did say it, it's totally immaterial here. This was said as part of the 2001 process, a process that was wiped clean in 2002 when entirely new decision-makers decided that Mr. Selle should be a B and then a C. And Mr. Moore, it is undisputed and absolutely no involvement in any of the retention exercises, whether 2001 or 2002, other than to decide an administrative appeal, in which he testified, again, without rebuttal, that the only issue he faced was procedural. Did they follow the correct process? He had no substantive role whatsoever. Touching on Mr. Needle's argument that that should be probative of the fact that there's a corporate culture that was, in fact, looking to get rid of the older people. The cases that he relies on deal with situations where there's quite a bit more evidence of what we're seeing here. CEOs, for example, saying things like this in public pronouncements. This is a bottom-level employee, not a manager, saying something allegedly offhand. It's the only piece of evidence that's suggestive of any bias whatsoever in the corporate culture. And it has to be looked at against a mountain of evidence that shows that older people were not at all disadvantaged in these processes. There's one thing that the court should just be aware of. Notice there's zero statistical evidence presented by the plaintiff in this case. And, in fact, at the lower court, in the record, there's only one piece of statistical evidence at all. And it had to do with the 2001 retention exercise. And it shows that older workers, workers over 50, did better in the process in terms of being put into the A and B, the protected slots, than workers under 50. That's the only statistical evidence in this case. If I could talk just briefly about the actual layoff and the fact that I guess to rebut the argument that the fact that Mr. Selley was... If I could ask the court just to take a look at the chart that we handed you at the very beginning. This is reproduced from our brief. And it is a cleaner and easier version to read of ER 228 and 229, which is the basic Excel spreadsheet that was used during the retention process. Now, you can see on that spreadsheet in the record that age is found nowhere there, years of service nowhere there. Nothing in that, the type of spreadsheet that was used during the process, is at all suggestive of the age. Now, what this chart does is it takes the information from that spreadsheet, 228 and 229 ER, and then it adds in data from the work histories for the individuals that are on that spreadsheet. And that's at ER 235 to 271. It's a fairly painstaking process to add them in one at a time, and so I thought I would do it for the court to save your clerks a little time doing it. They obviously can go back and double-check it and make sure it's right. But what we're left here with is a chart that shows all of the Cs in Mr. Selle's work group after the 2002 exercise. And the ones that are highlighted are the ones that were laid off in the months after that. Now, you can see that this is, frankly, no reasonable jury could look at this chart and look at how the layoffs were and decide that it was actually Boeing's process to lay off from the bottom to the top because it doesn't remotely come close to that. And if you look at the budget numbers, which is how Boeing designates its organizations in the far right-hand column, you can also see, illustrating the point I raised earlier, that these folks that are working the Babel 8 job title are all over the Puget Sound working for different directors doing different functions. And so it only makes sense that you would do the layoffs one at a time by organization and by director. And the second thing that this point points out is you can't draw an inference of age bias based on the sequence in which people are laid off. Because the bottom two that we know their ages of, the very bottom person, we don't have her work history, so I don't know what her age is. But the bottom two that we know her ages on were not laid off, and they were 61 and 57. So clearly, if it was supposed to work bottom to the top and it didn't work that way, it didn't do it in any way that suggested that it was slanted against older people. It's entirely random. I mean, there are young people who are 43 and 40 years old who are laid off when there are seven or eight people that are in their 50s below them on the ranking that were kept on. Just a real brief comment, because this is sort of hidden in plaintiff's brief, but I just want to make sure that I address it. It's not part of the argument, but in the opening brief, he suggests that he applies for another job and doesn't get it and identifies two younger people that were hired in that job. There's no evidence submitted by the plaintiff, and there's no evidence in the record about that job at all, whether Mr. Sully was qualified for it. You can't. There's just zero evidence and there's no argument, so that can't be the basis of the claim. That is everything that I had to cover with you, unless anybody has any further questions. I don't think so. Thank you, Mr. Sanders. Mr. Needle? It's a little bit frustrating to sit here and listen to Mr. Sanders speak, because he asserts these facts and then says, well, then it's unrebutted, and he just chooses to ignore the facts and testimony that contradicts him that's in the record. And the trial court agreed with Mr. Sanders, and the trial court ignored it too, and maybe ultimately this court will ignore it, but I hope that it won't. He says, for example, that Mr. Sully's duties and responsibilities were assumed by Darlene Torres and easily absorbed, and it only took her two to four hours to do them. But what he doesn't tell the court is that Macy Moran was the one who would be supervising Ms. Torres, and she said that she had to correct Ms. Torres's work every single time she did it, so they weren't easily absorbed. Mr. Sanders keeps on telling this court that the layoff was done at an organizational level and not an enterprise level, and he gives you all these wonderful explanations of how that must be true. But I asked Mr. Bowman exactly that question. I asked Geraldine Trout exactly that question. I asked Mr. Olney exactly that question, and they all said that the layoff was not done by organization. It was done enterprise-wide, and it doesn't matter which director the laid-off employee came from. Mr. Sanders just put his head in the sand and just ignored this testimony as if it doesn't exist, and I suggest that's not proper. Okay, Mr. Newton, what difference does it make? Well, it makes a difference, Your Honor, because they laid them off out of order. That's the problem, and they say they're not supposed to follow the order. They say they don't have to follow the order, and we say the testimony in the record is that, quote, under no circumstances would they lay them out out of sequential order, and the only reason why they say they can get away with that is because they didn't lay them off enterprise-wise. They laid them off organizationally, and the evidence is to the contrary, Your Honor. The evidence is to the contrary. Bowen's own policies state that they're supposed to lay them off sequentially. If they had done that, Mr. Selley wouldn't have been laid off. They laid them off out of order, and, Your Honor, they laid them off before substantially younger people, and, yes, people who they say are substantially less qualified. It seems to me, based on the argument, the way I see it going, is the whole case may turn on whether or not they legitimately considered his job functions that he was doing at the time. They say that's what the whole case is about. That's where they say they laid him off, and there's evidence in the record to the contrary. I asked Geraldine Trout about that. I asked whether or not his current job assignment was a criteria in the retention process. I asked her specifically, and she specifically said the answer is no. Mr. Sanders chose to ignore that testimony. The trial court chose to ignore that testimony, and I'm hoping this court won't choose to ignore this testimony. Mr. Sanders makes some interesting arguments, and I reject every single one of them, and I'm a rational human being. I like to think so, and I believe that a rational jury could likewise reject them. They don't have to see it Mr. Sanders' way. A rational jury can conclude to the contrary. Let them go back to the trial court and make those arguments to the jury, and if he does, we believe that we'll win. We have a right to our day in court. Thank you, Your Honor. Thank you, Mr. Neagle. Thank you, counsel. The matter just argued to be submitted, and the court will stand in recess for the day.
judges: Nelson, Rymer, Beam